**Sigmund FRIED, et al.**

v.

**SUNGARD RECOVERY SERVICES, INC., et al.**

**Civil Action No. 95–CV–0878.**

United States District Court, E.D. Pennsylvania.

April 30, 1996.

Mark R. Cuker, Steven M. Schain, Williams & Cuker, Philadelphia, PA, for Plaintiffs.

Roger F. Cox, Kenneth N. Klass, Jordana Cooper, Blank, Rome, Comisky & McCauley, Philadelphia, PA, for Sungard, Dibrino, and Mulholland.

John P. McShea, III, Eckert Seamans Cherin & Mellott, Philadelphia, PA, for Intech Corp.

## MEMORANDUM

JOYNER, District Judge.

This action is brought under the Clean Air Act (CAA), 42 U.S.C. §§ 7401–7671q (1995). Today we address Defendant Sungard Recovery System's Supplemental Motion for Summary Judgment, filed at our request to clarify the issues remaining for decision. We requested further briefing focused on the following questions: (1) what constitutes a renovation operation; (2) was the requisite amount of asbestos affected within any one renovation operation so that the National Emission Standards for Hazardous Air Pollutants (NESHAPS) for Asbestos, 40 C.F.R. §§ 61.140—61.157, requirements were triggered; (3) if so, were any NESHAPS re-

quirements violated (4) and if so, are these violations continuing or were they repeated. Findings made in our preliminary memorandum may be modified by this memorandum given the additional arguments and evidence presented by the parties. Plaintiff alleges three general areas of violation and we will use that framework to structure this Memorandum.

## I. 1992–1993 MEGACENTER EXPANSION

The first question we ask is, what is a planned renovation operation. The NESHAPS define a planned renovation operation as a "renovation operation, or a number of such operations, in which some [Regulated Asbestos–Containing Material] RACM will be removed or stripped and that can be predicted. Individual nonscheduled operations are included if a number of such operations can be predicted to occur during a given period of time based on operating experience." 40 C.F.R. § 61.141.

Plaintiff reads this definition to include all renovation activities that are planned together and taken as a part of a larger project. With this reading, he contends that all of the projects that Defendant treated as part of its 1992–1993 MegaCenter Expansion comprise one planned renovation operation.

For the purposes of understanding the following discussion, it is not necessary to know what each project was, but simply to understand that Defendant had possession of the sixth floor of 401 North Broad Street in 1980. From 1981 on, it leased additional space and conducted renovations in a piece-meal fashion. In 1991, Defendant and its contractors determined that in order to best serve the future needs of the company, it was necessary to create a Master Plan to govern all future renovations. To that end, Defendant and several contractors met over a series of months to plan the MegaCenter Expansion on the Sixth and Seventh floors.

According to Defendant's records, the projects making up the MegaCenter Expansion were:

# 1    UPS, Sixth Floor/Seventh Floor

# 2    Sixth Floor Renovations

# 3    Ready–Conditioned Expansion, Seventh Floor

# 4    Lobby/Administration, Seventh Floor UPS (Phase 2), Site Prep.

# 5    Seventh Floor, T & O Conversion Services

# 6    Sixth Floor, Phase II (including corridor flooring)

# 7    Mezzanine Package

# 8    Seventh Floor, T & O Conversion (Northside)

# 9    UPS (Phase III, Generator and Loading Dock)

Defendant's records demonstrate that although each project was individually priced and scheduled, the entire project was coordinated together. Therefore, Plaintiff maintains, they comprise one planned renovation operation.

In contrast, Defendant contends that a planned renovation operation is any discrete renovation project. It stresses the fact that the above-mentioned projects were individually priced, scheduled and budgeted and maintains that this shows that they were independent renovation operations. For this reason, Defendant argues that the analysis is properly focused on each project by itself, and not the conglomerate MegaCenter Expansion.

■ We find that at least for the purposes of summary judgment, the MegaCenter Expansion is one planned renovation operation and so we look at all the individual activities as part of a greater whole. Having answered the first question, we turn to the second; whether the triggering amount of asbestos was involved in the renovation operation.

The NESHAPS's notice and work practice responsibilities are only implicated if a minimum amount of RACM is to be "stripped, removed, dislodged, cut, drilled, or similarly disturbed during the course of a renovation." 40 C.F.R. § 61.145(a)(4).[1] The parties prof-

---

**1.** The minimum amounts are either 260 linear feet or 160 square feet of RACM. 40 CFR § 61.145(a)(4)(i).

fer different approaches to resolve whether the minimum amount was at issue in any planned renovation operation. They call these the "calendar year," "given time period" and "single operation" approaches.

■ We find that the regulations' language adequately explains the appropriate standard, however. The regulations state that to determine if the minimum amount of asbestos is involved in "planned renovation operations involving individual nonscheduled operations, [we should] predict the combined additive amount of RACM to be removed or stripped during a calendar year." 40 C.F.R. § 61.145(a)(4)(iii). Accordingly, if the minimum amount is disturbed in any one calendar year, then the entire renovation operation, even if taking place over more than one year, is covered by the NESHAPS. For example, if a renovation operation is scheduled to take ten years, and if in each year 16 square feet of RACM is to be removed, the operator can predict that during the entire renovation operation a total of 160 square feet of RACM will be removed. Under our reading of the regulations, however, the NESHAPS would not be triggered. This makes sense because the amount of RACM to be disturbed each year is negligible. In contrast, if the ten year renovation operation is to involve the removal of 160 square feet of RACM in the first calendar year but no more thereafter, the NESHAPS would appropriately be triggered because the amount of RACM to be disturbed in the first calendar year is of sufficient magnitude that the NESHAPS's protections should be implicated.

So, we ask whether Plaintiff has created a material issue of fact as to whether, in either 1992 or 1993, at least 160 square feet or 260 linear feet of RACM was disturbed during the course of the MegaCenter Expansion. Plaintiff only alleges that one particular activity involved the requisite amount of RACM, that being the removal of tile from the Sixth Floor corridor in 1992. He apparently agrees that the 1993 activities did not

cumulatively disturb the minimum amount of asbestos.

When Defendant took over the Sixth Floor in 1980, it was one large, open area with no interior walls. To make the space more useable, Defendant built interior walls, and of necessity, corridors. The corridor at issue was first created in 1981 and ran from the elevator lobby, which is slightly west of the center of the building, in an easterly direction to about ⅓ of the way from the eastern side of the building. The floor of the corridor was tiled with pink 12 × 12 inch floor tile. In 1984, Defendant decided to extend the corridor to the end of the building. To do this, it continued the existing hall further east, but part-way through the extension, made a short left turn, then a right, before continuing east to the end of the building. This jog created what is referred to as the "dog leg" portion of the corridor. The existing hall and the portion added west of the dog leg is referred to as the "straightaway" portion of the hall. The 1984 addition was tiled in the same 1981 pink tile so as to create the impression of a continuous hall.

In 1989, Defendant determined that the 1981/1984 tile had not worn well, and so placed a second layer of 12 × 12 inch pink tile over the existing tile. Then, in 1992 as part of the MegaCenter Expansion, Defendant decided to modify the entire area. One component of the renovation was to turn the crooked corridor into one straight passageway. To do this, Defendant removed all the existing tile in the straightaway portion of the hall and replaced it with sheet vinyl. The straightaway portion continued to the end of the building in a newly created hall. The old dog leg portion of the corridor became part of two rooms now known as Command Centers A and F. These rooms have raised floors that were placed over the existing tile.

It is on this final 1992 renovation that Plaintiff's claim is based. Plaintiff contends that when Defendant originally created the corridor in 1981 and again in 1984, there was already existing tile in the area, and that this tile was Vinyl Asbestos Tile, or VAT.[2] Plain-

---

2. The parties apparently agree that the original tile was 9 × 9 inch tile and that 9 × 9 inch tile of a certain age contains RACM 95% of the time.

Accordingly, the parties apparently agree, at least for purposes of this motion, that if this tile existed, it was VAT.

tiff declares that Defendant placed the 1981/1984 and 1989 layers of tile over this existing tile. Therefore, according to Plaintiff, when the floor was stripped bare in 1992, the workers took away not only the 1981/1984 and 1989 layers, but also the original, asbestos, layer. Because the area of the straightaway is apparently greater than 160 square feet, the entire corridor being 2726 square feet, Plaintiff contends that the NESHAPS requirements were triggered.

The first piece of evidence that Plaintiff proffers to support this theory is that testing has revealed an old layer of VAT underlying the 1981/1984 and 1989 layers in the dog leg portion of the hall remaining under the raised flooring in Command Centers A and F. To Plaintiff, this fact indisputably leads to the conclusion that this third layer of tile also existed under the straightaway portion in 1992.

The second piece of evidence is the deposition testimony of Julian Onorato, Defendant's former Vice–President for Operations, who joined Defendant some years after the 1981/1984 activities. He testified that in 1992, Sam Rizzo, Defendant's Director of Facilities Engineering, told him that the 1981/1984 layer was placed on top of an existing layer of VAT.[3]

In contrast, Defendant contends that the above evidence simply does not create a genuine question of fact as to whether more than 160 square feet of RACM was removed in the course of the 1992 tile removal. First, it points to the deposition testimony of people who have first hand knowledge of the 1981/1984 tiling jobs. Those people, including Rizzo, uniformly testified that the corridor floor was stripped bare before the 1981/1984 layer was laid. Defendant also points to Rizzo's declaration, wherein he avers that one of Plaintiff's trial exhibits, a 1984 drawing, indicates that the 1984 layer of tile was to be laid only after the existing tile was removed.

Second, it points to the deposition testimony of the contractor who performed the 1992 tiling job. He testified that before he began to remove the existing tile he tested to deter-

mine how many layers there were. He lifted sample tiles from the 1984 end of the straightaway and found only two layers of tile, the ones laid in 1984 and 1989. Defendant points out that in order for the 1981 and 1984 sections of the floor to be flush with each other, they had to have the same number of layers of tile beneath them. Therefore, Defendant contends, evidence of only two layers of tile in the 1984 end shows that there had to have been only two layers of tile in the 1981 end.

Third, Defendant casts doubt on Plaintiff's evidence with respect to Command Centers A and F. Defendant contends, first, that just because there is VAT in the old dog leg portion of the corridor does not mean there was VAT in the straightaway portion. It maintains that in contrast to the straightaway portion, the dog leg part of the hall was not a main corridor, nor one that customers were ever in. Therefore it was natural, Defendant reasons, that the straightaway would have received greater care than the dog leg portion.

Further, Defendant contends that even if we assume that the dog leg and straightaway portions were treated similarly, the VAT found in the dog leg actually supports its contention that the straightaway floor was scraped in 1981 and 1984. This is because testing indicates that the dog leg's VAT layer is or may exist only in spots. Defendant maintains that this proves that there was scraping. At best, Defendant's argument is that the incomplete scraping in the dog leg section shows that the two sections were unequally treated, with the straightway fully scraped, and the dog leg receiving some residual scraping. At worst, Defendant contends that even if the straightaway was only partially scraped, Plaintiff has made no showing that the unscraped part amounted to 160 square feet.

Defendant encourages us to deny summary judgment only if Plaintiff meets the same burden he will have to meet at trial. This is a motion for summary judgment, however, and so we view all facts in the light most

---

3. We presume that Rizzo is an agent of Defendant so that his statement, offered by Plaintiff, is the admission of a party opponent. F.R.E. 801(d)(2)(D).

favorable to Plaintiff and draw all reasonable inferences in his favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Plaintiff has not presented any evidence as to the amount of VAT that presently exists in the old dog leg. Accordingly, we cannot infer that the same amount existed under the straightaway, or infer that however much was there amounted to 160 square feet. For that reason, we cannot rely on this evidence to create a fact question.

Onorato's testimony, however, does create a genuine issue of material fact. He avers that Rizzo told him that the 1981/1984 tile was laid over an existing layer of tile. Rizzo avers the exact opposite. For the purposes of this motion, we infer that the existing tile was VAT and that the quantities involved were more than 160 square feet. Given this, we find a genuine issue of material fact as to the existence of sufficient asbestos to trigger the NESHAPS.

Accordingly, we turn to our third question; whether Plaintiff has demonstrated a genuine issue of material fact as to whether any of the NESHAPS were violated in connection with the MegaCenter Expansion. Plaintiff's alleged violations with respect to the sixth floor tile removal are failures to: (1) inspect the site, (2) provide notice, (3) adequately treat the tile during removal, storage and disposal, (4) hire a certified abatement company to perform the work and (5) maintain adequate records. *See* 40 C.F.R. §§ 61.145(a), (b) & (c)(2, 4, 6, 8); 61.150(a)(ii) & (d); 61.154(b). Plaintiff alleges similar violations for other parts of the MegaCenter Expansion work.

Defendant contends that the NESHAPS were not implicated by the tile removal because any asbestos that may have been present was not made friable. 40 C.F.R. § 61.141. It presents evidence that the workers chipped the tile off in whole chunks, never making the material friable. In contrast, Plaintiff presents evidence that the tile was frequently broken into small pieces and became dust; in other words, made friable. We find a material issue of fact as to this point. In general, Plaintiff has presented evidence that creates genuine questions as to whether, if the NESHAPS applied, Defendant complied with them.

■ Given this, we turn now to the final question, whether those violations were repeated or continuing. The Third Circuit has ruled that a plaintiff can prove continuing violations at trial either by showing a "likelihood of recurring violations of the same parameter; or second, by proving a likelihood that the same inadequately corrected source of trouble will cause recurring violations of one or more different parameters." *NRDC v. Texaco,* 2 F.3d 493, 499 (3d Cir.1993).

Plaintiff's evidence is that Defendant did not inspect its facility before it began renovations and that all the work practice and notice violations flow from this failure to inspect. Further, Plaintiff presents evidence that at the time this lawsuit was filed, Defendant planned further renovations to the Seventh and Sixth Floors that would entail the removal of 2900 square feet of VAT, but that not until some weeks after the suit was filed did Defendant contract with an asbestos abatement firm or survey the remaining unsurveyed portion of the Seventh Floor. Moreover, Plaintiff argues, there is evidence that Defendant has failed to fully comply with the asbestos program it established after this suit was filed and that Defendant's Executive Vice President of Operations testified that he thought the abatement program was overkill and that the program was adopted because of the lawsuit. This evidence goes to show that there is a reasonable likelihood that Defendant's violations will recur after this lawsuit.

Plaintiff also argues that the NESHAPS violations were repeated. He contends that the NESHAPS for Asbestos constitute one parameter, such that under *Texaco,* so long as there were at least two NESHAPS violations, the violation was repeated. Plaintiff also argues, in the alternative, that the notice and inspection requirements are two parameters, the requirements with respect to removing pipe insulation is another, and requirements with respect to floor tile removal is a fourth. Plaintiff contends that violations of each of these parameters was repeated. For example, Plaintiff contends that the Sixth Floor tile removal, even though com-

pleted in just one weekend, constituted repeated violations in that the one project violated the inspection, notice and work practice regulations. *Citing United States v. Midwest Suspension & Brake*, 824 F.Supp. 713, 728–33 (E.D.Mich.1993), *aff'd*, 49 F.3d 1197 (6th Cir.1995).

In *Midwest Suspension*, the District Court looked to violations of discrete NESHAPS requirements, rather than the general notice, inspection and work practice requirements. For example, it found that the failure to place all asbestos-containing waste into the proper containers was one violation, the failure to properly seal the containers was another and the failure to properly label the containers was yet another. *Id.* at 733. It rejected, however, the argument that if, for example, two containers were not labeled, this amounted to two separate violations. *Id.*

■ We take the same approach and so we do not consider that all general violations having to do with removing asbestos pipe insulation, for example, are subsumed in one parameter; rather, we read each particular requirement to be its own parameter. Given this, we turn to the alleged violations taking place during the MegaCenter Expansion. Plaintiff alleges a variety of illegal asbestos removals, including those referred to as the "Ray Seserko" incident and the Seventh Floor South Central Steam Riser. Both of these projects were allegedly faulty for their lack of notice, the absence of licensed abaters and the lack of a record of proper disposal. In other instances, Plaintiff alleges that asbestos pipe insulation was improperly removed, stored, labeled and disposed of from many different pipes.

We find that Plaintiff's evidence is sufficient to create a genuine issue of material fact as to whether the NESHAPS violations were continuing at the time this action was filed and are reasonably likely to continue. In addition, we find that Plaintiff has adequately presented a disputed issue of fact as to whether particular NESHAPS requirements were repeatedly violated at different times during the course of the MegaCenter Expansion. Having found genuine issues of material fact with respect to all four ques-

tions, we deny summary judgment as to the MegaCenter Expansion project.

## II. 1990 SEVENTH FLOOR NORTH BUILDOUT

In 1990, Defendant renovated the north side of the Seventh Floor. Before construction began, Defendant hired an environmental consulting company to perform an asbestos survey and hired a certified asbestos abatement contractor to perform the abatement. It also filed a notice of asbestos abatement for the project. For the purposes of this motion, Defendant does not contest that the Seventh Floor North Buildout constitutes one renovation operation and that more than the minimum amount of asbestos was involved so that the NESHAPS requirements were triggered. For this reason, the first two questions are answered in Plaintiff's favor. Despite this, however, Defendant contends that it did not violate any NESHAPS requirements and so summary judgment is appropriate.

Plaintiff identifies many alleged NESHAPS violations with respect to this renovation operation. These violations occurred during five different projects or incidents. We will describe the incidents and then address each type of violation separately.

First is the "Cleo Jones" incident. Cleo Jones worked for Defendant's construction contractor in 1990. He testified at deposition that he was instructed to, after normal working hours, remove approximately 12 feet of asbestos insulation from a pipe. He testified that he wet down the insulation, cut it from the pipe with a utility knife, placed the insulation in a plastic garbage bag, taped the bag shut and left it on the Seventh Floor for pickup. The second incident is the "Joseph Fiorelli" incident. Mr. Fiorelli, another construction worker, testified that while he worked at Defendant's premises, he cut asbestos pipe insulation away from pipes at least once, and maybe seven times. He also testified that at least once, he saw dry asbestos pipe insulation lying in an open dumpster.

The third and fourth incidents took place in the Sixth Floor Bathrooms and the Seventh Floor Mechanical Room, which are apparently directly below and above each other.

Although the notice indicates that the abatement contractor would perform the Seventh Floor work, that company's supervisor testified that no such work was actually done by his company.

The final incident concerns the Seventh Floor Bridge Area. Plaintiff claims that Defendant's records indicate that 30 feet of asbestos pipe insulation were removed by the abatement company, but that the company's invoices do not indicate that it ever charged Defendant for this work. This discrepancy, Plaintiff contends, indicates that the work was actually done by someone else.

### Notice Violations

Plaintiff contends that each incident demonstrates that Defendant violated the notice it filed. This argument is based on the evidence that the noticed certified abatement company did not perform the abatements, the asbestos was not disposed of at the noticed landfill and the abatements did not take place during the time frame or locations identified in the notice.

Defendant claims that questions as to who performed the removal are red herrings, because the 1984 NESHAPS did not require a certified abatement person to supervise or perform removals until 1991. Defendant also maintains that there were no notice violations because the NESHAPS only required re-notification if the amount of asbestos to be affected was more than 20% of the original amount noticed. Because the cumulative amounts alleged to have been removed did not rise to this quantity, Defendant contends that there were no notice violations.

■ We find that Plaintiff has presented evidence that on several different occasions, asbestos was removed in a manner not in accordance with Defendant's notice. Defendant's re-notification argument addresses a different issue. Even though Defendant may not have been required to re-notify, it still had to abide by its original notice. For this reason, we find material issues of fact as to the notice issues. Moreover, there is evidence that Defendant violated its notice more than once, meeting the 'repeat' requirement.

### Storage

Plaintiff contends that in each incident, the asbestos was not stored in the proper containers, stored so that the asbestos would remain wet or stored in properly labeled containers. His evidence is that Jones simply placed wet asbestos into duct-taped trash bags, Fiorelli simply threw dry asbestos onto the floor, and that because the other incidents took place in the same time frame, it is reasonable to infer that the asbestos from those jobs was not stored properly either. Defendant contends that there is no evidence either way with respect to storage or labeling in every incident but the Fiorelli incident, and that Fiorelli's testimony lacks credence.

Jones's testimony was detailed, and a fair inference on summary judgment is that if he did not mention labels, then there were no labels. Therefore, there is a question of fact as to whether his bag was properly labeled. There is also a question of fact as to whether his bag was an appropriate container, because Plaintiff's expert opines that a trash bag sealed with duct tape is not leak-tight. We also find an issue of fact as to whether asbestos was properly stored and labeled in the Fiorelli incident. Because these are two incidents, the repeated requirement is met. We do not find issues of fact as to the other incidents, because there is no evidence as to them from which we can infer anything.

Having found genuine issues of material fact with respect to whether the NESHAPS were repeatedly violated, we deny summary judgment as to the 1990 Seventh Floor North Buildout.

### III. FAILURE TO SURVEY

Finally, Plaintiff asks this Court to consider other renovation projects even though there is no evidence that they met NESHAPS's minimum amount. Plaintiff presents evidence that the Sixth Floor was never surveyed until 1995, despite the fact that renovations began in that space in 1981, and that the southern part of the Seventh Floor was not surveyed until 1995, despite renovations conducted there from 1991 to 1994.

· Plaintiff argues that Defendant's failure to survey is the reason why there is no evidence

372

of the amount of asbestos removed, and so any presumptions of amount should be made against Defendant. In addition, Plaintiff contends that the NESHAPS required a survey regardless of the amount of asbestos involved, and so Defendant's failure to survey is an independent NESHAPS violation.

■ Defendant argues that it had no duty to inspect unless the requisite amounts of asbestos were involved. This argument is unsupported by the NESHAPS, however. The regulations instruct the owner or operator of a facility to, "prior to the commencement of the demolition or renovation, thoroughly inspect the affected facility or part of the facility where the demolition or renovation operation will occur for the presence of asbestos." 40 C.F.R. § 61.145(a). A renovation is defined as "altering a facility or one or more facility components in any way." 40 § C.F.R. 61.141. A renovation is not limited to an activity that involves asbestos. For this reason, Defendant had a duty to inspect its facility regardless of the amount of asbestos it was aware of before the inspection.

Based on this, we find a genuine issue of material fact as to whether Defendant complied with the NESHAPS's survey requirements.

An appropriate Order follows.[4]

### ORDER

AND NOW, this 30th day of April, 1996, upon consideration of Defendant's Supplemental Motion for Summary Judgment and responses thereto, the Motion is hereby DENIED in accordance with the attached Memorandum. Further, Defendant's Motion to

Strike Affidavit of John Chase is hereby DENIED as MOOT.

4. Several other issues remain for resolution. First, given the result of Defendant's Motion, we also deny summary judgment on Plaintiff's claim for injunctive relief.

Second, this Court ordered supplemental briefing and granted the parties leave to file a motion, response and reply. In addition, Plaintiff filed a sur-reply. We did not rely on this pleading in deciding Defendant's Motion. For that reason, Defendant's Motion to Strike the Affidavit of John Chase attached to Plaintiff's sur-reply is moot.

Third, in Defendant's Motion to Strike, it encourages this Court to dismiss this action for lack of subject matter jurisdiction because Plaintiff's

notice letter has been revealed to be factually incorrect, in that he now does not allege asbestos violations in all parts of the building, as the notice letter implies. We retain jurisdiction over this action, however, because Plaintiff did provide the required notice in a timely fashion in accordance with his understanding of the facts at the time. Thus, his notice served the purposes desired by the CAA. *See e.g. Public Int. Research Grp. v. Hercules, Inc.,* 50 F.3d 1239, 1249 (3d Cir.1995) ("ultimate goal of a citizen suit is to bring the alleged violator into compliance with the nation's environmental laws.... judge the sufficiency of the plaintiffs' 60–day notice letter in terms of whether it accomplishes these purposes").